Exhibit B



# Local Television Station
# Music Performance Blanket License

AGREEMENT, made at New York, N.Y. on _____, 20_____, between BROADCAST MUSIC, INC., a corporation organized under the laws of the State of New York (BMI) with principal offices at 7 World Trade Center, 250 Greenwich St, New York, NY 10007-0030, and

_____
*(Legal Name of Licensee)*

**Please Check Appropriate Box And Complete**

☐ A corporation organized under the laws of _____

☐ A limited liability company organized under the laws of _____

☐ A partnership composed of _____

☐ An individual residing at _____

_____

(LICENSEE) with offices located at _____

City _____ State _____ Zip _____ Telephone No. _____

and operating the television broadcasting station located at _____

City _____ State _____ Zip _____ Telephone No. _____

and presently designated by the call letters _____ (Station) (the "Agreement").

## IT IS HEREBY AGREED AS FOLLOWS:

1. **TERM.** The term of this Agreement shall be the period beginning [_____] and ending December 31, 2004, unless earlier terminated as hereinafter provided.

2. **DEFINITIONS.** As used in this Agreement, the following terms shall have the following respective meanings:

    (a) **"Affiliated Station"** shall mean any free, over-the-air television broadcasting station licensed by the FCC which is located in the United States, its commonwealth, possessions and territories, that regularly broadcasts Programs transmitted by a television network licensed by BMI during the term hereof.

    (b) **"Announcement"** shall mean any commercial, promotional, or public service announcement (exclusive of program length "infomercials" of greater duration than 120 seconds), or any producer's or distributor's logo.

    (c) **"BMI Consent Decree"** shall mean the consent decree entered in United States v. BMI, 64 Civ. 3787 (LLS) (S.D.N.Y.), as amended.

    (d) **"COMMITTEE"** shall mean the Television Music License Committee, an unincorporated membership association organized under the laws of the State of New York, which is duly authorized to represent local television stations in music licensing matters.

    (e) **"LMA Operator"** shall mean any person, firm or corporation not under the same or substantially the same ownership, management or control as LICENSEE with whom LICENSEE has entered into a Local Marketing Agreement.

    (f) **"Local Marketing Agreement"** shall mean any arrangement between LICENSEE and an LMA Operator that:
        (1) authorizes the resale by an LMA Operator of the use of the television broadcasting facilities of Station;
        (2) permits an LMA Operator to provide Programs for all or substantially all of the time Station is on the air; and
        (3) provides for the sale by an LMA Operator of all or substantially all Announcements broadcast on Station.

(g) **"Network Announcement"** shall mean any Announcement transmitted by a television network licensed by BMI as a network at the time such Announcement is broadcast on the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of a network licensed by BMI.

(h) **"Network Television Program"** shall mean any Program, transmitted by a television network licensed by BMI as a network at the time such Program is broadcast on the network, identified as a Program of the network, and broadcast simultaneously or by so-called "delayed" or "repeat" broadcasts (sometimes known as "rebroadcasts") over two or more Affiliated Stations of a network licensed by BMI.

(i) **"Non-Network Announcement"** shall mean any Announcement broadcast by Station other than a Network Announcement.

(j) **"Non-Network Television Program"** shall mean any Program broadcast by Station other than a Network Television Program.

(k) **"Program"** shall mean all material (visual or otherwise) broadcast by Station other than Announcements.

(l) **"Station"** shall mean and be restricted to the FCC-licensed commercial television broadcasting station whose ownership and call letters are indicated above.

(m) **"Station Web Site"** shall mean the Web Site operated by or for Station as the Station's Web Site.

(n) **"Syndicated Television Program"** shall mean any Non-Network Television Program supplied to LICENSEE and other television stations by a producer or a distributor, or by a television network which is not licensed by BMI.

(o) **"Television Broadcasting"** shall mean free, unscrambled, point-to-multipoint over-the-air local broadcasting by means of television.

(p) **"Web Site"** shall mean an Internet computer service comprising a series of interrelated web pages registered with a domain name registration service that Station transmits or causes to be transmitted either directly or indirectly to persons who receive the service over the Internet by means of a personal computer or by means of another device capable of receiving Internet transmissions. Station's current Web Site URL is http://_____.

3. GRANT OF RIGHTS.

(a) BMI hereby grants to LICENSEE, for the term hereof, a non-exclusive license to perform publicly all musical works the right to grant public performing right licenses of which BMI may during the term hereof control:

(i) by Television Broadcasting in the United States, and its territories, commonwealth and possessions, as part of LICENSEE's Non-Network Television Programs and Non-Network Announcements from Station; and

(ii) in and as part of a single Station Web Site transmitted or caused to be transmitted either directly or indirectly over the Internet but only in connection with:

(A) the simultaneous retransmission of the Station's locally produced and aired programming;

(B) the retransmission of all or a portion of Station's local newscasts and local news based public affairs programming that aired during the Term of this Agreement; and

(C) other transmissions the primary purpose of which are to promote viewership of Station and its television programming; *provided, however*, that: (1) no single performance licensed under this subsection (C) may exceed thirty (30) seconds in duration; and (2) the total duration of all performances of BMI-repertoire works under this subsection (C) available at any single time for listening on Station's Web Site may not exceed fifteen (15) minutes in duration.

(b) Notwithstanding the foregoing, the license granted herein shall not include transmissions described in subparagraphs 3(a)(ii)(A) and 3(a)(ii)(B) above where such transmissions contain programming which is nationally or regionally aired regularly scheduled series programming (e.g., Regis and Kelly, George Michael's Sports Machine, and Major League Baseball). In the event that Station airs locally-produced programming, and such programming also appears on one or more additional stations (which programming for purposes of this Agreement would not be considered locally produced and aired programming for the additional station(s)), only the Station may retransmit BMI music contained in such programming in the manner described in subparagraphs 3(a)(ii)(A) and 3(a)(ii)(B) above, while the additional station(s) may not.

(c) The license granted herein does not cover transmissions on Station's Web Site of BMI music where members of the public are charged a fee for the right to access such transmissions. Such transmissions shall be subject to appropriate separate licensing. Notwithstanding the foregoing, the fact that a Station may charge members of the public for access to discrete areas of the Station's Web Site other than those areas containing the performances licensed hereunder shall not limit the scope of this license.

(d) With respect to any portion of the Term prior to January 1, 2002, the Web Site license granted under Paragraph 3(a)(ii) shall be limited to those transmissions of BMI music as described in Paragraph 3(a)(ii)(C) above.

(e) For the rights granted in Paragraph 3(a)(ii) only, the territory shall mean the United States, its commonwealth, territories and possessions and the territories represented by non-U.S. performing right licensing organizations posted as Exhibit C in the licensing section of the BMI web site located at http://www.bmi.com. Such list may be amended by BMI at any time and without notice. Notwithstanding the foregoing, the territorial scope of the grant of rights in Paragraph 3(a)(ii) with respect to any musical works which are affiliated with BMI through a non-U.S. performing right licensing organization not listed on Exhibit C is limited to public performances in the U.S. Territory.

(f) The performances licensed hereunder may originate at any place whether or not such place is licensed to publicly perform the musical works licensed hereunder, and regardless of the manner, means or method of such origination, but nothing herein shall be deemed to grant a license to such place itself (or to the parties responsible for such performances) for the public performances in such place of any such works.

(g) The license granted herein shall not include dramatic rights, the right to perform dramatico-musical works in whole or in substantial part, the right to present individual works in a dramatic setting or the right to use the music licensed hereunder in any other context which may constitute an exercise of the "grand rights" therein. It is nonetheless expressly understood that nothing contained in this Paragraph shall be construed so as to limit the ability of LICENSEE to perform, by Television Broadcasting, any works contained in Syndicated Television Programs, motion pictures initially produced for theatrical exhibition or music videos which LICENSEE would otherwise have the right to perform under this Agreement.

(h) BMI will, upon specific reasonable written request made by LICENSEE, indicate whether one or more specified musical works listed by LICENSEE are licensed by BMI. LICENSEE shall provide the title and the writer/composer of each musical composition requested to be identified.

(i) Except as expressly herein otherwise provided, nothing herein contained shall be construed as authorizing LICENSEE to grant to others any right to reproduce, retransmit or publicly perform by any means, method or process whatsoever, any of the musical works licensed hereunder or as authorizing any receiver of any television broadcast to publicly perform or reproduce the same by any means, method or process whatsoever.

(j) The license granted herein shall not include the right to adapt the musical works licensed hereunder or to make any other versions thereof.

(k) The license granted herein shall include on a non-precedential, experimental basis the right to engage in such non-dramatic public performances of musical works in BMI's repertoire as may result from Station's free, over-the-air broadcasts of BMI music within its existing geographic market(s) over FCC assigned frequencies, by means of a digital television signal. It is understood that the right to perform works in the BMI repertoire by means of a digital television signal is being included in this Agreement because digital television is a new technology and such grant of rights reflects the experimental character of such broadcasts. Station shall provide BMI, in electronic form, annual reports concerning LICENSEE's digital television signal, using the form attached hereto as Exhibit D. The form shall be filed during the month of October of each of the years 2002, 2003 and 2004.

4. LICENSE FEE/STATEMENTS.

This Agreement expressly incorporates, and LICENSEE agrees to be bound by, the terms of the letter agreement between BMI and COMMITTEE attached hereto as Exhibit A.

(a) BROADCAST TELEVISION PAYMENTS FOR 2002, 2003 AND 2004. LICENSEE shall pay to BMI for each month during the calendar years 2002, 2003 and 2004, a fee equal to one twelfth (1/12) of LICENSEE's allocated share of the annual industry-wide BMI blanket license fee of $85 million, as allocated according to the methodology prescribed in Schedule I to Exhibit A. Such fee shall be payable no later than the first calendar day of the month succeeding the month to which the fee is attributable. In no case shall LICENSEE's monthly fee be less than $45.00.

(b) BROADCAST TELEVISION PAYMENTS FOR APRIL 1, 1999 THROUGH DECEMBER 31, 2001. LICENSEE agrees to pay BMI, in addition to the interim license fees that were heretofore payable by LICENSEE to BMI in respect of the period from April 1, 1999, through and including December 31, 2001, under the interim BMI Local Television Station Music Performance Blanket or Per Program License for Station, such amounts and at such times as are provided for in Paragraph 2 of Exhibit A concerning the Settlement Fee.

(c) WEB SITE PAYMENTS FOR 2002, 2003 and 2004. LICENSEE shall pay to BMI for each month during the calendar years 2002, 2003, and 2004, a fee equal to one twelfth (1/12) of LICENSEE's allocated share of the BMI annual Internet fee as set forth in Exhibit A and as determined by the COMMITTEE. Such fee shall be payable to BMI no later than the first calendar day of the month succeeding the month to which the fee is attributable.

(d) If any payment due hereunder is not received by BMI in the twenty (20) days following the date on which such payment is due, BMI may collect a late-payment charge of one percent (1%) per month (simple interest) calculated from the date such payment was due.

5. MUSIC PERFORMANCE REPORTS.

(a) BROADCAST TELEVISION REPORTS. LICENSEE, upon written request from BMI made on notice of not less than four (4) weeks specifying the period to be covered, agrees to furnish (on forms to be supplied by BMI and/or available on BMI's web site) reports of LICENSEE's performances by Station of all musical works, indicating

the works performed by title and composer or by such other convenient method as may be designated by BMI. In no event shall such reports be furnished for more than one (1) week of each year of the term. It is expressly understood that, with respect to any Syndicated Television Programs, LICENSEE's obligation to report music data to BMI under this Paragraph shall be limited to providing BMI with the title and episode name or number of such Syndicated Television Program(s); if no cue sheet is available, LICENSEE shall cooperate with BMI in attempting to obtain such cue sheets and/or in providing BMI with access to a tape or recording of the Syndicated Television Program involved. In addition to these reports, LICENSEE shall provide a list of its Non-Network Announcements for the week (*e.g.*, traffic reports); LICENSEE may redact any revenue or financial information from this list, provided that the list includes the name of the commercial, the dates and number of times it was broadcast and the ISCI code number for the commercial.

(b) WEB SITE REPORTS. LICENSEE shall notify BMI in writing, using the form attached hereto as Exhibit B, reasonably promptly after beginning to stream its over-the-air broadcast television signal or to distribute a Web Site licensed pursuant to this Agreement. Thereafter, upon written request from BMI made on notice of not less than four (4) weeks specifying the period of time to be covered, LICENSEE shall provide to BMI, in electronic form, a music use report for a period specified by BMI not to exceed one month for each calendar year during the Term of the Agreement using the form attached hereto as Exhibit C. BMI reserves the right to request from LICENSEE information sufficient to identify the title(s) of any Program(s) promoted on individually retrievable archived promotional announcements on the Web Site as part of such reports.

6. INDEMNIFICATION. BMI agrees to indemnify, save and hold harmless and to defend LICENSEE, its advertisers and their advertising agencies, and its and their officers, employees and artists, and each of them, from and against all claims, demands and suits that may be made or brought against them or any of them with respect to the performance under this Agreement of any works in the BMI repertoire that are licensed hereunder; provided, however, that such indemnity shall be limited to those claims, demands and suits that are made or brought within the United States, its territories, commonwealth and possessions, and provided further that this indemnity shall not apply to broadcasts of any musical work performed by LICENSEE which is not contained in the BMI repertoire at the time of performance by Station or which is the subject of a written notice of withdrawal in accordance with Paragraph 7 hereof. LICENSEE agrees to give BMI immediate notice of any such claim, demand or suit and agrees to deliver immediately all papers pertaining thereto. BMI shall have full charge of the defense of any such claim, demand or suit, and LICENSEE shall cooperate fully with BMI therein. LICENSEE, however, shall have the right to engage counsel of its own at its own expense who may participate in the defense of any such action. The provisions of this Paragraph shall survive termination of this Agreement, but solely with respect to performances broadcast by Station during the term of this Agreement.

7. WITHDRAWAL OF WORKS. BMI reserves the right upon written notice to LICENSEE to withdraw from the license granted hereunder any musical work as to which any legal action has been instituted or a claim made that BMI does not have the right to license the performing right in such work or that such work infringes another work. BMI shall notify LICENSEE as promptly as reasonably possible of any such withdrawal and shall attempt to determine and advise LICENSEE at the time of such notice of any Syndicated Television Program in which any such withdrawn work may be contained.

8. ASSIGNMENT. This license shall be non-assignable except to the person, firm or corporation acquiring the Federal Communications Commission license of Station, and upon assignment to the acquiring person, firm or corporation and upon the acceptance by BMI in form approved by BMI of the application of LICENSEE hereunder, LICENSEE shall be relieved of future liability under this Agreement as long as all statements have been submitted by LICENSEE and all fees due BMI under this Agreement have been paid to BMI. Nothing herein is intended to limit the new owner's entitlement to a license pursuant to Article XIV of the BMI Consent Decree.

9. ARBITRATION.

(a) With the specific exception of disputes which may be within the jurisdiction of the United States district court having jurisdiction under the BMI Consent Decree, all disputes of any kind, nature or description arising in connection with the terms and conditions of this Agreement shall be submitted to the American Arbitration Association in New York, New York for arbitration under its then prevailing rules, the arbitrator(s) to be selected as follows: Each of the parties shall, by written notice to the other, have the right to appoint one arbitrator. If, within ten days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be the sole arbitrator. If two arbitrators are so appointed, they shall appoint a third arbitrator. If ten days elapse after the appointment of the second arbitrator and the two arbitrators are unable to agree upon the third arbitrator, then either party may, in writing, request the American Arbitration Association to appoint the third arbitrator. The award made in the arbitration shall be binding and conclusive on the parties and judgment may be, but need not be, entered thereon in any court having jurisdiction. Such award shall include the fixing of the reasonable costs, expenses and attorneys' fees of arbitration, which shall be borne by the unsuccessful party, subject to the provisions of subparagraph (b) below.

(b) If, during the term of the Agreement, any dispute arises between BMI and LICENSEE concerning the interpretation of any of the provisions of this Agreement, the resolution of which, in the judgment of BMI or COMMITTEE, either jointly or severally, has or may have industry-wide impact, BMI and COMMITTEE shall first endeavor to resolve such dispute, failing which either party may refer the matter to arbitration (unless the parties agree on some alternative mechanism for dispute resolution); and LICENSEE agrees to be bound by the results of all of such arbitrations involving BMI and COMMITTEE. In the event of such a reference, each party shall bear its own costs, expenses and attorneys'

4

fees. In the event of such a reference, either party, as a preliminary matter, shall be entitled to assert that the dispute between them is not properly dealt with under the terms of this subparagraph.

10. TERMINATION BY LICENSEE. LICENSEE shall have the right to terminate this Agreement, upon ten (10) business days' notice to BMI, in the event of: (a) the termination or suspension of the governmental licenses covering LICENSEE, or any substantial alteration or variation of the terms and conditions thereof; or (b) the suspension of operations by Station for a substantial period of time.

11. BREACH OR DEFAULT. Upon LICENSEE's breach or default of any payment, accounting or substantive reporting obligation required under the terms of this Agreement, BMI may give LICENSEE thirty (30) days' notice in writing to cure such breach or default. In the event that such breach or default has not been cured within thirty (30) days of said notice, BMI may then terminate this Agreement.

12. NOTICE. Any notice of termination given hereunder shall be given by registered or certified mail or delivery service for which there is proof of delivery to, and receipt by, the addressee. Any other notice required or permitted to be given under this Agreement shall be in writing and shall be deemed duly given when sent by ordinary first-class U.S. mail to the party for whom it is intended, at its office address hereinabove stated, or any other address which either party hereto may from time to time designate for such purpose, and when notice is so mailed, it shall be deemed given upon the mailing thereof. Any notice sent to BMI shall be to the attention of S.V.P. Licensing Department. Any notice sent to LICENSEE shall be to the attention of the person signing this Agreement on behalf of LICENSEE or such other person as LICENSEE may advise BMI.

13. PER PROGRAM LICENSE. LICENSEE acknowledges that the BMI Local Television Station Per Program License for the term commencing January 1, 2002 and ending December 31, 2004 (the "Per Program License") has been offered to LICENSEE simultaneously with this Agreement and LICENSEE is hereby electing this Agreement instead thereof. During the term of this Agreement, provided that LICENSEE is not more than ninety (90) days in arrears in payments due hereunder, LICENSEE may hereafter elect to switch from this Agreement to the Per Program License as of the first day of a calendar month, prospectively on thirty (30) days' prior written notice to BMI (an "Election"). By making an Election, LICENSEE agrees to be bound by all the terms of the agreement elected. Thereafter LICENSEE may switch back to the Blanket License as provided for in the Per Program License. An Election to change between this Agreement and the Local Television Station Per Program License may be made by LICENSEE not more than twice in any calendar year 2002, 2003 or 2004.

14. INTERFERENCE IN OPERATIONS. In the event that any law hereafter enacted of the state, or political subdivision thereof, in which LICENSEE is located shall result in major interference with the operations of BMI in that state or political subdivision, or in a substantial increase of the cost to BMI of operating within that state or political subdivision, BMI shall have the right, upon notice to COMMITTEE and upon a showing that the matters referred to affect the licensing of performing rights under this Agreement, to apply to the judge with supervisory authority over the BMI Consent Decree for whatever relief BMI deems appropriate, including termination of this Agreement.

15. LOCAL MARKETING AGREEMENT.

(a) If LICENSEE is, or becomes, a party to a Local Marketing Agreement, LICENSEE and the LMA Operator shall execute a letter to BMI, in the form attached as Exhibit E and made a part of this Agreement, requesting amendment of this Agreement to add the LMA Operator as a party. When such a letter has been fully executed by LICENSEE, the LMA Operator and BMI, this Agreement shall be deemed amended accordingly.

(b) BMI shall be entitled to receive, upon request, a copy of the entire Local Marketing Agreement or, if LICENSEE so elects, a copy of the portion of the agreement which sets forth the respective obligations of LICENSEE and the LMA Operator regarding the payment of BMI fees, accountings, record keeping and administrative responsibilities. An officer of LICENSEE shall certify that it is a true and correct copy of the agreement.

16. CONFIDENTIALITY.

(a) BMI shall treat as confidential, and shall not disclose to any third party (other than its employees, directors and officers, in their capacity as such, on a need-to-know basis, and other than as set forth in subparagraph (b) below), any financial or other proprietary documents or information provided to BMI by LICENSEE in connection with this Agreement.

(b) BMI is hereby authorized to provide to COMMITTEE such of LICENSEE's financial or other proprietary documents or information, provided to BMI pursuant to this Agreement, as COMMITTEE may request in connection with its representation of the local television industry in future negotiations with BMI, future rate court proceedings, litigation or disputes over the implementation or interpretation of this Agreement, unless LICENSEE notifies BMI in writing to the contrary. As reflected in Exhibit A hereto, COMMITTEE has agreed to treat as confidential any financial or other proprietary documents or information provided to it by BMI pursuant to this Paragraph.

17. WITHOUT PREJUDICE. The parties are entering into this Agreement without prejudice to any arguments or positions they may assert in any future rate proceeding concerning what constitutes reasonable blanket and per program license fees and terms for the local television industry, or, in BMI's case, as to any other licensee. The information that LICENSEE has agreed to provide under Paragraph 5 (b) shall not prejudice any position either party may take in any future negotiation, proceeding or litigation as to the relevance or necessity of such information in licensing musical

performances over the Internet.

18. RESERVATION OF RIGHTS. The license granted in Paragraph 3(a)(ii) is experimental in nature. BMI and LICENSEE recognize that the license granted therein covers certain transmissions originating from and/or received in certain territories outside of the United States, its commonwealth, possessions and territories pursuant to experimental agreements with certain non-U.S. performing rights licensing organizations around the world, and is broader in geographical scope than BMI's previous licenses. Notwithstanding, BMI is offering the license in Paragraph 3(a)(ii) on an experimental and non-prejudicial basis for the purpose of evaluating such international licensing initiatives. Accordingly, the removal during the Term of any or all of the territories listed on Exhibit C in the licensing section of the BMI web site located at http://www.bmi.com from the scope of coverage provided for in Paragraph 3(a)(ii) shall have no impact on the fees due hereunder. The Parties hereby expressly reserve their right to re-evaluate the appropriateness of the fees and terms herein with respect to all transmissions licensed under Paragraph3(a)(ii), including, but not limited to, the reasonable value of a license that covers transmissions beyond the United States, its commonwealth, possessions and territories, for periods following the Term.

19. MISCELLANEOUS. This Agreement, and all Exhibits hereto, constitutes the entire understanding between the parties and cannot be waived or added to or modified orally, and no waiver, addition or modification shall be valid unless in writing and signed by the parties. This Agreement, its validity, construction and effect shall be governed by the laws of the State of New York. The fact that any provisions herein are found to be void or unenforceable by a court of competent jurisdiction shall in no way affect the validity or enforceability of any other provisions.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement the day and date hereinbefore set forth.

BROADCAST MUSIC, INC.

|  |  |
| --- | --- |
|  | LICENSEE (Legal Name) |
| By: _____ | By: _____ |
| (Signature) | (Signature) |
| _____ | _____ |
| (Print Name of Signer) | (Print Name of Signer) |
| _____ | _____ |
| (Title of Signer) | (Title of Signer) |

6

TELEVISION MUSIC LICENSE COMMITTEE

# EXHIBIT A

May 17, 2002

Broadcast Music, Inc.
320 West 57th Street
New York, N.Y. 10019

Attention: Mr. John Shaker

Re: <u>BMI – Local Television Station Blanket and Per Program Licenses</u>

Dear Mr. Shaker:

This letter sets forth the agreement reached between Broadcast Music, Inc. ("BMI") and the Television Music License Committee (the "COMMITTEE") concerning certain additional terms of the BMI – Local Television Station Blanket and Per Program License Agreements covering the periods April 1, 1999 through December 31, 2004 (herein "Blanket Licenses" and "Per Program Licenses", and collectively referred to as "Licenses"). This letter agreement is expressly incorporated in paragraph 4 of the Blanket and Per Program Licenses, respectively, and is binding upon the parties hereto and upon the signatories to the Licenses and their successors and assigns.

The parties agree as follows:

1. For the years 2002, 2003 and 2004, domestic commercial television stations that were licensed by BMI in 2001 pursuant to interim licenses agreed to between BMI and the COMMITTEE ("Existing Television Stations") shall pay license fees to BMI as follows:

(a) Existing Television Stations entering into the Blanket License with BMI, or switching thereto, shall each pay BMI each year their allocated share of the annual industry-wide BMI blanket license fee of $85 million, at such times and in such manner as provided therein for such years (or portions thereof) that they have elected to be bound by a Blanket License. The methodology for the allocation of blanket license fees among Existing Television Stations for each of those calendar years is set forth in Schedule I hereto.

(b) Existing Television Stations entering into Per Program Licenses with BMI, or switching thereto, shall each pay BMI such fees, and at such times and in such manner, as are provided therein. Per Program License Fees for Existing Television Stations shall be computed based upon each station's Monthly Base License Fee. For each calendar year 2002, 2003 and 2004, each Existing Television Station's Monthly Base License Fee shall be equal to one-twelfth of its share of the annual industry-wide BMI per program license fee of $98.1 million, subject to subparagraph (c) hereof.

(c) In the event that during the term of the Licenses, the COMMITTEE negotiates with the American Society of Composers, Authors and Publishers ("ASCAP") an annual industry-wide per program license fee, or the ASCAP rate court establishes an annual industry-wide per program license fee for ASCAP in a proceeding no longer subject to appeal, different from $98.1 million, then the parties agree that the ASCAP amount will be substituted for the $98.1 million figure in paragraph (b) prospectively from the effective date of such ASCAP fee change for any period remaining in the term of the Licenses; provided, however, that substitution of the base fee shall only occur if the material non-fee terms and conditions of the ASCAP per program license are similar to the terms and conditions of the BMI Per Program License.

9 East 53rd Street, 5th fl., New York, NY 10022 phone: (212) 308-9040 fax: (212) 754-9286

(d) Each Existing Television Station shall pay to BMI its allocated share of the annual industry-wide BMI Internet blanket license fee of $558,333.33 in each of the years 2002, 2003 and 2004. An Existing Television Station's allocated share of the industry-wide BMI Internet blanket license fee shall be calculated by multiplying $558,333.33 times a factor representing the percentage of the industry-wide BMI blanket license fee that is allocated to the station in a given year pursuant to Schedule I to this letter agreement. For example, a station with an annual blanket license fee of $850,000 (or 1% of the industry-wide blanket license fee for the year 2003) shall be allocated 1% of the industry-wide BMI Internet blanket license fee (or $5,583.33).

2. For the period from April 1, 1999, through December 31, 2001 (the "Settlement Period"), BMI and the COMMITTEE agree that Existing Television Stations shall pay to BMI their allocated share of the industry-wide lump-sum settlement fee of $12 million (the "Settlement Fee"), which payments will represent, when combined with the interim fees payable to BMI under the interim BMI Blanket and Per Program Licenses agreed to by BMI and the COMMITTEE for that period, the final license fees payable for the Settlement Period. The COMMITTEE shall allocate the Settlement Fee among the Existing Television Stations, and shall provide BMI prior to February 15, 2002 with a schedule that details the amounts to be billed to each station. The stations' shares of the Settlement Fee shall be billed in equal monthly installments over a 36 month period commencing January 1, 2002, separately from the stations' monthly payments as calculated pursuant to Paragraph 1(a) above and Schedule I to this letter agreement.

3. Subject to Paragraph 7 below, if for any part of the term of this letter agreement, BMI enters into a License with a television station that is not an Existing Television Station (a "New Television Station"), the New Television Station shall pay BMI license fees, whether under the Blanket License or the Per Program License, as the case may be, as follows:

(a) if the New Television Station was previously licensed by the FCC and operating as a broadcast television station for more than twelve (12) months prior to entering into a License with BMI, then the fees payable by all stations in the New Television Station's local market as of the effective date of the New Television Station's license agreement shall be reallocated under Schedule I hereto as if such station were an Existing Television Station and without any increase in the total fee amount otherwise allocable to the relevant local television market. The New Television Station and all other licensees in its local market shall thereafter be obligated to pay such re-allocated fees; or

(b) if the New Television Station was not previously licensed by the FCC and operating as a broadcast television station for more than twelve (12) months prior to entering into a License with BMI, such station shall pay the minimum monthly fee of forty-five dollars ($45.00) for the remainder of the calendar year following the effective date of its license agreement. Thereafter, the fees payable by all stations in the New Television Station's local market shall be reallocated under Schedule I hereto as if such station were an Existing Television Station and without any increase in the total fee amount otherwise allocable to the relevant local television market. The New Television Station and all other licensees in its local market shall thereafter be obligated to pay such re-allocated fees.

(c) BMI shall be obligated to notify licensees in writing as to any adjustment in their fees resulting from the reallocation procedures set forth in Paragraphs 3(a) and (b) within ten (10) days of the determination of such reallocated fees. In the event an Existing Television Station's fees are reduced as a result of any such reallocation, BMI shall credit such licensee's account for the amount of any such excess fees which have already been paid by such licensee as of the effective date of reallocation, or, if such licensee so elects, BMI shall, within thirty (30) days of receiving notification of such election, refund to licensee the amount of any such excess fees.

4. If, during the term of this Agreement, BMI licenses any entity agreed or determined to be a broadcast television "network" previously unlicensed by BMI (such as FOX, UPN, or The WB), whose network programs are carried by local television stations licensed by BMI pursuant to the Licenses, the industry-wide amounts set forth in Paragraph 1 above pertaining to the periods of such third party license agreements shall be adjusted downward in an appropriate amount. BMI shall have the ultimate responsibility for re-allocating industry-wide blanket license fees to reflect any such reduction, following consultation with the COMMITTEE. BMI and the COMMITTEE will confer and attempt to reach agreement concerning the appropriate amount of any such fee adjustments and such agreement shall be binding on all licensees. If BMI and the COMMITTEE shall fail to agree on such fee adjustments, either party may refer the matter to the federal judge with supervisory authority over the BMI Consent Decree for determination.

5. BMI shall provide to the COMMITTEE or its designated representative for verification, by no later than forty-five (45) days before its scheduled dissemination to licensees, a copy of each list of Syndicated Television Programs prepared pursuant to Paragraph 6(c) of the Per Program License. The COMMITTEE shall notify BMI of any suggested revisions or corrections to this list no later than three weeks from the date it was received.

6. If, for any part of the term hereof, a station previously licensed by BMI under a separate agreement changes its format and elects to be licensed pursuant to a License, such station's blanket and per program license fee allocations shall be determined pursuant to the methodology set forth in Schedule I as though it were an Existing Television Station, except that: (a) such station's allocated blanket or per program license fee shall be in addition to the industry-wide blanket or per program license fees set forth in Paragraph 2 above; and (b) blanket or per program license fees allocated

to other stations in the same market shall be determined as if such station were not licensed pursuant to a License, and thus shall remain unchanged.

7. The COMMITTEE shall treat as confidential any financial or other proprietary information or documents provided to it by BMI pursuant to the Local Television Station Per Program License Agreement ("Confidential Information"). The COMMITTEE shall limit access to Confidential Information to the COMMITTEE's staff, representatives and counsel, and shall not disclose Confidential Information to any third party or to any COMMITTEE member, other than a COMMITTEE member who is employed by the station group which provided Confidential Information to BMI.

8. BMI and the COMMITTEE are entering into this Agreement without prejudice to any arguments or positions they may assert in any future rate proceeding concerning what constitutes reasonable blanket and per program license fees and terms for the local television industry or, in BMI's case, as to any licensee.

Please indicate your agreement to the above by signing on the line provided below.

Very truly yours,

s/ Chuck Sennet                              s/ Catherine Nierle

Co-Chair                                     Co-Chair

Television Music License Committee           Television Music License Committee

AGREED TO:

s/ John Shaker

Senior Vice President/Licensing

Broadcast Music, Inc.

# Television Music License Committee
# Methodology for Industry-Wide BMI License Fee Allocation for the Period From January 1, 2002 through December 31, 2004

### STEP 1: Allocation of Industry-Wide Fee Among DMA Markets

In a given year, each television market is to be assigned its allocable share of the $85 million industry-wide blanket license fee based on a weighted, three-year average percentage of the total U.S. television households it represents.[1]

1. For each of the years 2002 through 2004 ("Contract Years"), the number of TV households in each of the roughly 210 DMA markets as measured by Nielsen[2] is to be "weighted" as follows:

| | |
|---|---|
| Markets 1 - 10 | Multiply by 1.19 |
| Markets 11 - 25 | Multiply by 1.05 |
| Markets 26 - 50 | Multiply by 0.92 |
| Markets 51 - 75 | Multiply by 0.85 |
| Markets 76 - 100 | Multiply by 0.85 |
| Markets 101 - 125 | Multiply by 0.85 |
| Markets 126 plus | Multiply by 0.80 |

The purpose of the weighting is to reflect, within broad parameters, that a household in the 150th market does not represent the same value as a household in the New York market.

2. For each Contract Year, each market is to be assigned its share of the industry's overall $85 Million blanket license fee by the following procedure: Each market's three-year households average (based on the three prior years) will be computed. The multiples set forth in Paragraph 1 above will next be applied to these market rankings resulting from computation of the three-year averages to produce a weighted average households figure for each market. Thus, for example, the top ten markets in terms of three-year households average will receive a 1.19 multiple. Each market's weighted average households figure is to be divided by the total U.S. average weighted households to derive a percentage of U.S. weighted TV households for each market. This weighted percentage is then applied to the industry-wide blanket license fee. Thus, if the weighted percentage of total U.S. TV households for market "x" is one percent, market x's share of the Contract Year 2002 industry-wide blanket license fee would be $85 Million x 1%, or $85,000.

### STEP 2: Allocation of Blanket License Fees to Stations Within Each Market[3]

A series of computations will be undertaken to apportion a given market's allocated blanket license fee in relation to each station in that market's viewing households (with an allowance for a portion of the prime-time audience reached by network-affiliated stations).[4]

1. For Contract Year 2002, the process will begin with Nielsen's Market Ratings Reports for the "sweeps" months assigned for these purposes to each of 1999, 2000 and 2001. Within each market, each station's average DMA quarter-hour viewing households, Sunday through Saturday, 9 a.m. through midnight, is to be computed for each of the sweeps months for each of 1999, 2000 and 2001. The same methodology is to be utilized for Contract Year 2003 (employing comparable Nielsen viewership data for the three years 2000, 2001 and 2002) and Contract Year 2004 (employing comparable Nielsen viewership data for the three years 2001, 2002 and 2003).[5]

2. To make allowance for the fact that a portion of a network affiliate's 9 a.m. to midnight schedule constitutes BMI licensed network programming, the following computations, which lead to each station's "qualifying" viewing households, are to be made for each sweeps month:

---

1. In addition, in a given year, each television market is to be assigned its allocable share of the industry-wide base per program license fee (as set forth in paragraphs 1(b) and (c) of Exhibit A to the BMI Local Television Station Music Performance Blanket and Per Program Licenses) pursuant to the methodology described in this Step 1.

2. The number of television households in television markets located in: Alaska and Hawaii shall be determined based upon data collected by Nielsen; Virgin Islands and Guam shall be determined based upon data collected by the United States Census; and Puerto Rico shall be determined based upon data collected by Media Fax. For purposes of assigning an allocable share of the industry-wide blanket license fee to television markets in Alaska, Hawaii, Virgin Islands, Guam and Puerto Rico, the number of television households in each of these markets is to be given the same weight as the Nielsen DMA that most closely approximates the number of television households in these markets.

3. The computations described in this Step 2 will also be used to apportion a given market's allocated base per program license fee among the stations within that market.

4. Network-affiliated stations are defined as those affiliated with the ABC, CBS, and NBC television networks and those affiliated with, but not owned by, the Univision Television Network

5. For purposes of these calculations, the sweeps months for a given year comprise the November sweeps period of the prior year, and the February and May Sweeps period of that year. For example, the designated sweeps months for 2000 are November 1999 and February and May 2000.

10

(a) multiply each station's average DMA quarter-hour viewing households by 420 (the number of quarter-hour units between 9 a.m. and midnight in one week). For independent stations, the result of this computation constitutes those stations' qualifying viewing households.

(b) with respect to the allocation of fees for network-affiliated stations, arrive at "qualifying" viewing households by subtracting from the totals generated by step (a) 100 percent of a prime-time viewing households figure, which figure (prior to application of the 100 percent factor) is calculated by taking a station's average DMA quarter-hour households in prime-time, and multiplying this figure by 88 (the number of quarter-hour units in prime-time in one week.[6])

3. The nine separate months of DMA viewing households data thus derived for each independent and affiliated station in a market are next aggregated as to each station to arrive at its total qualifying viewing households. This is done for each station in the market. The qualifying viewing households data for all stations in the market are then aggregated to get a base for the entire market. Each station's percentage share of the allocated market blanket license fee (derived through the process described in Step 1, above) is computed by dividing its qualifying viewing households number by the base qualifying viewing households number for that market.

4. A station's blanket license fee is computed by applying the resulting percentage applicable to that station to the market blanket license fee.

5. In those markets having stations which receive no rating in the Nielsen reports and which are not separately licensed by BMI, the following methodology will be employed. Each such station will be assigned a blanket license fee equal to 0.25 percent of the allocable blanket license fee for that market or $540 annually, whichever is higher. The remaining stations will be allocated blanket license fees based on the methodology set forth in Step 2 hereof, except that the allocable blanket license fee for the market for purposes of those computations shall be reduced by the amount payable by those stations in the market not listed by Nielsen. If, by way of example, the blanket license fee allocated to market "k" is $300,000, and there are operating in market "k" two stations not listed by Nielsen, each of those stations would be assigned a blanket fee of $750 ($300,000 x .0025). The remaining stations in market "k" would pay their appropriate percentages, not of $300,000, but of $298,500.

6. The minimum blanket license fee for a given station shall be the greater of 0.25 percent of the allocable blanket license fee for its market or an annual blanket license fee of $540 (or $45 per month for partial years) ("Minimum Blanket License Fee").

7. If, during a given Contract Year, BMI enters into a license agreement with a television station that was not previously licensed (a "New Television Station"), the New Television Station shall be assigned blanket license fees as follows:

(a) if the New Television Station was previously licensed by the FCC and operating as a broadcast television station for more than twelve (12) months prior to entering into a license with BMI, then the fees payable by all stations in the New Television Station's market as of the effective date of the New Television Station's license agreement shall be reallocated pursuant to paragraphs 1 - 6 above without any increase in the total fee amount otherwise allocable to the relevant market; or

(b) if the New Television Station was not previously licensed by the FCC and operating as a broadcast television station for more than twelve (12) months prior to entering into a license with BMI, such station shall pay the minimum monthly fee of forty-five dollars ($45.00) for the remainder of the Contract Year following the effective date of its license agreement. The fees payable by all stations in the New Television Station's market in the following Calendar Year shall be reallocated under paragraphs 1 - 6 above without any increase in the total fee amount otherwise allocable to the relevant market.

---

6. *E.g.*, on the East Coast, prime-time occupies Monday-Saturday 8:00-11:00 p.m. and Sunday 7:00-11:00 p.m.

# BMI

**EXHIBIT B**

Broadcast Music, Inc.
7 World Trade Center
250 Greenwich Street
New York, NY 10070-0030
ATTN: BMI Local TV Web Site Licensing

Re: <u>Launch of Local TV Station Web Site</u>

To Whom It May Concern:

Please be advised that, on _____ (*day/month*), _____ (*year*), local television Station _____ (*call letters*) began distributing a web site known as _____ and located at the Uniform Resource Locater *(URL)* http:// _____ pursuant to the 1999-2004 BMI Local Television Music Performance Agreement.

| WEB SITE REPORT CONTACT: |
|---|
| NAME: _____ |
| TITLE: _____ |
| EMAIL: _____ |
| TELEPHONE: _____ |

Sincerely,

_____
(Signature)

Print Name: _____
Company: _____
Address: _____
_____
Telephone: _____
Fax: _____
Email: _____

**EXHIBIT C**

# LOCAL TV STATION WEB SITE
# MUSIC USE REPORT

Music use report for the period from _____, _____ through _____, _____
                                                        Month/Day,    Year          Month/Day,    Year

```
Legal Name: _____
Call Letters: _____
Address: _____
         _____
URL: _____
```

## WEB SITE TRAFFIC INFORMATION:
Total number of page impressions on the web site during the period: ☐

Total number of streamed transmissions during the period: ☐

**LIVE STREAMING:** the simultaneous transmission of station's locally produced and aired programming *(see Paragraph 3(a)(ii)(A) of the Agreement)*:

☐ Please check here if the TV Station Web Site engaged in the simultaneous retransmission of locally produced and aired programming during the period. Please identify such programming below (e.g., if all, write 'all'; if local newscasts only, write 'local newscasts'; if other programming, write the title(s) of such other programming).

_____
_____

**ARCHIVED STREAMING:** the transmission of station's local newscasts and/or local news based public affairs programming *(see Paragraph 3(a)(ii)(B) of the Agreement)*:

☐ Please check here if the TV Station Web Site engaged in the retransmission of local newscasts and/or local news based public affairs programming during the period. Please identify such programming below.

    ☐ Local Newscasts
    ☐ Local News Based Public Affairs Programming

**PROMOTIONAL CLIPS TO PROMOTE VIEWERSHIP OF STATION AND ITS TELEVISION PROGRAMMING** *(see Paragraph 3(a)(ii)(C) of the Agreement)*:

☐ Please check here if the TV Station Web Site contained individually retrievable, archived promotional announcements to promote viewership of station and its television programming during the period.

    Please check the appropriate box(es) to indicate the type(s) of programming:

    ☐ Syndicated Programs
    ☐ Network Programs
    ☐ Local Programming

I hereby certify on this ____ day of _____, _____ that the above is true and correct.

By:     _____
           *(SIGNATURE)*

        _____
           *(PRINT NAME OF SIGNER)*

        _____
           *(TITLE OF SIGNER)*

**BMI®**  EXHIBIT D

# DIGITAL SIGNAL QUESTIONNAIRE

*This questionnaire should be filled out and e-mailed to BMI during the month of October 2002, 2003 and 2004.*

Legal Name of Licensee: _____

Analog Signal Call Letters: _____

Station's Address: _____

City: _____   State: _____

1. Is the station currently broadcasting a digital signal?

   ☐ Yes

   ☐ No (Skip all remaining questions)

2. What are the call letters of your digital signal? _____-DT

3. What are the current weekly hours of on-air operation of your digital signal? _____

4. Does your digital signal programming consist completely of simulcasts of your analog signal programming?

   ☐ Yes (Skip the last question)
   ☐ No

5. If your digital signal programming differs from your analog signal programming, or if you have multicast programming in your digital signal, please identify all non-simulcast programming broadcast in your digital signal, including broadcast dates and times. (Please add additional sheets as necessary.)

_____

_____

_____

14



**EXHIBIT E**

## Local Marketing Agreement Amendment to Local Television Station Music Performance License Agreement

WHEREAS, _____ ("LICENSEE") has entered into a Local Marketing Agreement ("LMA") with _____ ("LMA OPERATOR") for the television station _____ (the "STATION") for the period _____ through _____; it is hereby agreed to as follows:

1. LICENSEE and LMA OPERATOR add LMA OPERATOR as a party to the BMI Local Television Blanket [Per Program] License Agreement, including all extensions, schedules and exhibits thereto, in effect between LICENSEE and BMI ("the License"), and LMA OPERATOR shall assume, with LICENSEE, all of the rights and obligations of LICENSEE set forth in the License for the full period of the LMA with respect to the STATION.

2. LICENSEE/LMA OPERATOR (circle one) shall be responsible in the first instance for the payment of any fees owing to BMI and for the submission to BMI of any reports or other information pursuant to the License for the full period of the LMA with respect to the STATION.

3. LICENSEE remains fully liable for all its obligations under the License. Even if the LMA OPERATOR is responsible in the first instance for the payment of fees and submissions of reports or other information to BMI as set forth in Paragraph 2 above, if LMA OPERATOR defaults in any way on those obligations, LICENSEE remains responsible for fulfilling those obligations.

4. LICENSEE and LMA OPERATOR jointly designate the following single address for billing, and other regular correspondence, and the following single address for any notices in accordance with the License.

**Billing Address:** _____  **Notice Address:** _____

5. In the event that the LMA between LICENSEE and LMA OPERATOR terminates, both LICENSEE and LMA OPERATOR shall notify BMI of the termination within 30 days, and submit all required statements, reports and payments through the date of said termination. In the event that both LICENSEE and LMA OPERATOR fail to notify BMI of the termination of the LMA, then both LICENSEE and LMA OPERATOR shall remain obligated under this agreement for all statements, reports and payments.

Dated: _____

**LICENSEE**

By: _____

Title: _____

Dated: _____

**LMA OPERATOR**

By: _____

Title: _____

Broadcast Music, Inc. hereby consents and agrees to the amendment of the above-mentioned License Agreement.

**BROADCAST MUSIC, INC.**

Dated: _____  By: _____

Title: _____

15