1   RAAQIM A. S. KNIGHT (Bar No. CA 217630)
    KNIGHT LAW GROUP
2   11601 Wilshire Boulevard
    Los Angeles, CA  90025
3   Telephone:  (424) 234-5244
    Facsimile:  (424) 234-5228
4
    *Attorney for Defendant*
5   YASMINAH COMBARY, and *Defendants and*
    *Counterclaimants* DEYON DAVIS and
6   CINEMATIC TUNES, INC.
7
8                 UNITED STATES DISTRICT COURT
9                CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  BROADCAST MUSIC, INC., a New York corporation, | No. CV 10-10089 RGK (FFMx) |
| 12 | [Assigned to the Honorable R. Gary Klausner] |
| 13          Plaintiff, | |
| 14      vs. | **COUNTERCLAIM** |
| 15  DEYON K. DAVIS, as an individual and d/b/a DEYON DAVIS MUSIC; | <u>JURY TRIAL DEMANDED</u> |
| 16  CINEMATIC TUNES, INC. a California corporation; YASMINAH | |
| 17  COMBARY, an individual; TYRONE THORNTON, an individual; | |
| 18  LAQUAJAWAN T. LANIER, an individual; WALTER LANIER, an | |
| 19  individual; LAMONT HART, an individual, | |
| 20          Defendants. | |
| 21 | |
| 22  DEYON K. DAVIS, an individual; CINEMATIC TUNES, INC. a | |
| 23  California corporation, | |
| 24          Counterclaimants, | |
| 25      vs. | |
| 26  BROADCAST MUSIC, INC., a New York corporation, | |
| 27          Counter-Defendant. | |
| 28 | |

                          **COUNTERCLAIM**

Deyon Davis ("Davis") and Cinematic Tunes, Inc. ("CTI") (collectively "Counterclaimants"), as and for their Counterclaim against Broadcast Music, Inc. ("BMI") allege as follows:

## PRELIMINARY STATEMENT

1. Metaphorically speaking, BMI is a bully. BMI deceptively lures unsuspecting songwriters and publishers into its playground (BMI's performing rights licensing and royalty system) with the promise of fun (the fair calculation and payment of royalties) and then spends the day bossing them around, beating them up and taking their toys.

2. Literally speaking, BMI uses misleading statements and omissions to induce songwriters and publishers to affiliate with BMI. Most of BMI's affiliated songwriters and publishers are unsophisticated and have limited means. Once affiliates have granted BMI the right to license their copyrighted music, BMI deliberately employs an unclear royalty calculation system and an unreliable system for tracking public performances in order to decrease the amount of royalties it must pay to its affiliates. BMI then purports to resolve royalty disputes with its affiliates by ignoring due process principles and instead serving as its own judge and executioner. The fact that BMI receives license fees for its affiliates' music directly from licensees and the disparity between BMI's resources and those of its affiliates enable BMI to impose its will, virtually unchecked.

3. Against this backdrop, Counterclaimants found themselves in a royalty dispute with BMI. BMI claimed that Counterclaimants had received certain royalty payments in error. Counterclaimants dispute BMI's claim. But by the time Counterclaimants were made aware of BMI's claim, BMI had already purported to unilaterally adjudicate the dispute in its favor. Ignoring due process principles, it was BMI's view that the only thing left to do after notifying Counterclaimants of its claim was to execute on the "judgment" it had rendered for itself.

4. Despite the fact that Counterclaimants' music catalog is among the

1

**COUNTERCLAIM**

1   most highly used catalogs in BMI's repertory, BMI has not paid Counterclaimants

2   any royalties in approximately a year-and-a-half.  BMI claims that it is withholding

3   Counterclaimants' duly earned royalties to recoup the alleged overpayments.  But

4   the agreements do not authorize the self-help remedies BMI is employing.  With

5   little to no regard for the welfare of Counterclaimants, BMI recklessly employed

6   "scorched earth" investigation procedures and heavy-handed litigation tactics

7   against Counterclaimants with the aim of forcing them into submission, not based

8   on the merits of their claims but rather in response to financial and professional

9   pressure applied by BMI.  Along with the deprivation of duly earned royalties,

10   BMI's actions have caused irreparable harm to Counterclaimants' business and

11   reputations. Counterclaimants seek redress for such harm.

12                   **JURISDICTION AND VENUE**

13       5.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. section

14   1367(a).

15       6.     Venue is proper in this district because this action was commenced by

16   BMI in the Central District of California; because BMI is subject to personal

17   jurisdiction in the Central District of California; and because a substantial part of

18   the events and/or omissions giving rise to the claims herein occurred in the Central

19   District of California.

20                         **THE PARTIES**

21       7.     Davis is an individual residing in Los Angeles County, California.

22       8.     CTI is a corporation, organized under the laws of the State of

23   California, with its principal place of business in Los Angeles County, California.

24       9.     On information and belief, BMI is a corporation, organized under the

25   laws of the State of New York, with its principal place of business in New York,

26   New York, whose primary business function is that of a music performing rights

27   licensing organization within the meaning of the Copyright Act, 17 U.S.C. section

28   116(e)(3).

**COUNTERCLAIM**

## STATEMENT OF FACTS

### BMI Misleads Potential Affiliates and the General Public

10.   On information and belief, BMI is one of three United States performance rights organizations ("PROs"), along with the American Society of Composers, Authors and Publishers ("ASCAP") and the Society of European Stage Authors & Composers ("SESAC").   In general, PROs provide intermediary functions, particularly royalty collection, between copyright holders and parties who wish to publicly use copyrighted works.  The public performance of virtually every musical composition copyrighted in the United States is licensed by either ASCAP or BMI.

11.   On information and belief, unlike ASCAP or SESAC, BMI is operated by and for the benefit of broadcasters.  Its shareholders are comprised exclusively of persons or entities who are or were broadcasters.  BMI's Board of Directors is comprised almost entirely of executives of major radio and local television broadcasters.  The Chairman of BMI's Board of Directors simultaneously serves as the Joint Chairman of the National Association of Broadcasters.

12.   BMI holds itself out to the public as a not-for-profit corporation, primarily motivated by the desire to serve and advance the interests of writers and publishers.  BMI describes itself as "a nonprofit corporation" that "undertakes the responsibility to collect performance royalties on the writers' and publishers' behalf and to distribute the monies so collected" after deducting a portion for operating expenses.  On its website, BMI declares:

- "BMI's formation provided an 'open door' to writers of all genres of music, many of whom had no prior access to performing right representation."

- "BMI was founded by radio executives to provide competition in the field of performing rights, to assure royalty payments to writers and publishers of music not represented by the existing performing right

3

**COUNTERCLAIM**

organization and to provide an alternative source of licensing for all music users."

- "BMI's market share reflects the popularity of its songwriters' and composers' works and is a prime factor in determining license fees."

- "In addition to acting on behalf of its members in collecting licensing fees and distributing them as royalties, the company offers a broad array of services, including workshops, showcases and discounts on career-oriented services and tools, to help its members develop professionally."

13. BMI's public statements, including (but not limited to) the foregoing, imply that it is as protective of writers' and publishers' rights as ASCAP and SESAC. BMI's statements to the public also imply that BMI serves merely as an intermediary that administers the licensing of copyrighted music on behalf of and for the convenience of copyright owners' in exchange for a reasonable commission necessary to pay BMI's operating expenses. In reality, BMI exercises ownership-like control over the copyright owners' music, resulting in profit sharing between BMI and the copyright owners that heavily favors BMI.

14. On information and belief, BMI generally issues blanket licenses, which purport to grant licensees the right to perform any composition in the BMI repertory as frequently as the licensee wishes during the term of the license. The fees payable to BMI by the end-user licensees do not vary either according to the significance, quality and value of any music used in a particular program or according to the extent to which music in the BMI repertory is actually used. Thus, the true financial burden of royalties payable to BMI's affiliate songwriters and publishers for the use of their compositions is borne solely by BMI. Put simply, BMI pockets the difference between the license fee obtained and the royalties paid. The result is that BMI receives a direct financial benefit when its principals, songwriters and publishers – i.e., the true copyright owners – earn fewer royalties.

4

**COUNTERCLAIM**

15.   On information and belief, BMI uses its subscription-based "blanket license" model as a justification for charging exorbitant license fees to licensees. But BMI does not pass the premium received for its blanket licenses on to its affiliates. This results in BMI (i.e., broadcasters) retaining an inflated share of the revenue generated by its affiliates' compositions. Such a proration is contrary to the representation that BMI merely collects royalties on its affiliates' behalf and then distributes the royalties after deducting "operating expenses."

16.   By failing to disclose the way BMI calculates royalty rates, BMI also misleads songwriters and publishers into believing that its royalty rates are based on, consistent with, or competitive with an independent industry standard. On information and belief, BMI's royalty rates are developed internally and arbitrarily. On information and belief, BMI maintains the secrecy of its royalty system so that it can deprive songwriters and publishers of royalties.

17.   Consistent with its overall goal of maximizing its value for its broadcast industry shareholders, BMI handles royalty disputes with its affiliates in a one-sided, heavy handed manner. When a royalty dispute arises, BMI's standard practice and policy is to withhold and/or assume control over the disputed royalties without due process, holding the funds hostage until the dispute is resolved to BMI's satisfaction.

18.   Royalties payable to the copyright owners under BMI's affiliate agreements are purportedly based on the nature and duration of public performances of their works. But BMI does not take reasonable steps to accurately track public performances on television shows. On information and belief, BMI primarily relies on the reporting of such performances by television show producers. The producers' tracking of performances is often inaccurate. Because the producers are paying BMI a flat rate, they have no incentive to accurately track performances – they pay the same fee regardless of whether their tracking is accurate or not.

5

**COUNTERCLAIM**

19.     On information and belief, BMI is aware that producers routinely fail to accurately track performances. BMI is also aware that more reliable alternative measures for tracking performances exist. But BMI continues to utilize and maintain its flawed tracking procedures because they usually results in lower royalties payable to its affiliates. Furthermore, because BMI receives a direct benefit from the underreporting of performances – i.e., lower royalties payable to affiliates – BMI does not take reasonable steps to investigate the accuracy of producers' reporting unless BMI believes such investigation will reveal overpayments of royalties.

**Davis' Successful Music Publishing Business and Reliance on BMI**

20.     Davis is a songwriter and entrepreneur. He is also a true American success story. For nearly twenty years, Davis worked hard, studied the music publishing industry and eventually built what has become a highly successful music publishing company.

21.     Davis began composing songs in or around 1992. On June 29, 1992, Davis executed a BMI standard affiliate agreement for song writers (the "Writer Agreement"). Pursuant to the Writer Agreement, Davis granted BMI the right to license his copyrighted works for public performances. In exchange, BMI promised to pay Davis "amounts calculated pursuant to [BMI's] then current standard practices upon the basis of the then current performance rates generally paid by [BMI] to [its] affiliated writers for similar performances of similar compositions." At that time, Davis believed that, pursuant to the Writer Agreement, BMI would serve as his agent – i.e., a "middle-man" – for the licensing of his music in exchange for a reasonable commission.

22.     The Writer Agreement also stated that "[t]he number of performances for which [Davis] shall be entitled to payment shall be estimated by [BMI] in accordance with [BMI's] then current system of computing the number of such performances." Based in part on this language, Davis believed that BMI could

**COUNTERCLAIM**

1    accurately track the public performances of his music.  The language also led Davis

2    to believe that he could rely on royalty statements and the royalties paid to him by

3    BMI.  If BMI had not made such representations, Davis would not have entered the

4    Writer Agreement.

5         23.    Thereafter, on May 23, 1995, Davis, through the fictitious business

6    name Deyon Davis Music ("DDM"), executed a BMI standard affiliate agreement

7    for music publishers (the "DDM Agreement") in order to exploit the publisher's

8    share of his copyrighted music.  Pursuant to the DDM Agreement, Davis assigned

9    to BMI the right to license works in which Davis owned copyright interest for

10   public performances.  In exchange, BMI promised to pay Davis "amounts

11   calculated pursuant to [BMI's] then current standard practices upon the basis of the

12   then current performance rates generally paid by [BMI] to its affiliated writers for

13   similar performances of similar compositions.

14        24.    Similar to the Writer Agreement, the DDM Agreement also stated that

15   "[t]he number of performances for which [DDM] shall be entitled to payment shall

16   be estimated by [BMI] in accordance with [BMI's] then current system of

17   computing the number of such performances."   This language reinforced Davis'

18   belief that BMI could accurately track the public performances of his and his

19   writers' music and that he could rely on royalty statements provided by to him by

20   BMI and royalties paid consistent therewith.

21        25.    Through his subsequent songwriting activities, Davis became

22   acquainted with many other songwriters in the music industry.  As he gained

23   experience, Davis learned that he may be able to earn a decent living as a music

24   publisher.  Music publishers commercially exploit the copyrights of music in their

25   catalogs, by licensing the various rights and encouraging maximum use of their

26   music.  Davis focused his efforts on music utilized in the motion picture and

27   television industries.  The use of compositions from a catalog by television or

28   motion picture producers is commonly referred to as a "placement."  Davis began

7

**COUNTERCLAIM**

building a catalog of music by forming relationships with his songwriter acquaintances. Davis soon learned that in order for him to attract the highest number of potential songwriters, he would need to form a corporation affiliated with BMI.

26.    To that end, Davis formed CTI in 2007 and CTI entered into a BMI standard affiliate agreement for music publishers (the "CTI Agreement"). Based largely on Davis' individual efforts, CTI has enjoyed phenomenal growth and success in the music publishing business. CTI currently represents approximately 300 to 500 songwriters. CTI secures placements for writers' compositions with many prominent production companies. CTI's music is used in many feature films – e.g., *The Invasion, The Crossing, Not Another Teen Movie, Tooth Fairy*, among many others – across network and cable television – e.g., NBC, ABC, CBS, FOX, VH1, MTV, HBO, BET, ESPN, Spike TV, among many others, including Spanish-speaking networks – and is regularly featured on the nation's most popular television shows – e.g., *Access Hollywood, America's Next Top Model, American Idol, The Bad Girls Club, Blue Bloods, CSI, CSI: Miami, E! News, The Good Wife, Jersey Shore, Keeping Up With the Kardashians, Kourtney and Kim Take New York, NASCAR on FOX, The NBA on FOX, NCSI, The NFL on FOX, The Office, Parks and Recreation, So You Think You Can Dance*, and *Superstars of Dance*, among many others. As of 2009, Counterclaimants were generating and administering roughly $1 million in royalties annually.

27.    As part of Counterclaimants' business model, they are perpetually seeking to increase the number of placements they secure for themselves and their songwriters. Counterclaimants have proven to be prolific in such endeavors. Counterclaimants compete with the "major" publishing companies with respect to the number of placements they secure. Counterclaimants welcome and expect increases in the number of performances being reported by licensees.

28.    By 2009, the sheer number of placements that Counterclaimants were

**COUNTERCLAIM**

1   securing made it impossible for them to accurately track the performances of their

2   copyrighted works.  Meanwhile, pursuant to their agreements with BMI, BMI was

3   required to perform such tracking services on Counterclaimants' behalf.  Although

4   they have occasionally suspected that performances of their copyrighted music

5   were underreported, when Counterclaimants receive royalty statements from BMI,

6   they often do not have the information necessary to challenge or verify the

7   performances   identified   therein   or   omitted   therefrom.       Accordingly,

8   Counterclaimants rely on their agent, BMI, to keep track of public performances of

9   their music and to advise them of the royalties they are due.  After all, BMI led

10  them to believe that it was primarily concerned with protecting and advancing their

11  interests.

12  **BMI's Overpayment Claim and Discovery of Its Earlier Misrepresentations**

13      29.   In or around June 2010, BMI contacted Counterclaimants and claimed

14  that it had overpaid Counterclaimants over $1 million in royalties for two seasons

15  of the television series *So You Think You Can Dance* and one season of the

16  television show *Superstars of Dance*.   BMI claimed that that the alleged

17  overpayments were the result of BMI's reliance on incorrect cue sheets submitted

18  to BMI by an independent contractor retained by the producer of *So You Think You*

19  *Can Dance* and *Superstars of Dance*.  Despite its awareness that Counterclaimants

20  had no way to verify BMI's claims, BMI demanded that Counterclaimants

21  immediately repay the funds.

22      30.   When BMI asserted the foregoing overpayment claims, it was the first

23  time that Counterclaimants were made aware of the fact that BMI does not employ

24  reasonable measures to accurately track public performances of their copyrighted

25  music.  The fact that BMI could have possibly erroneously paid such a large sum

26  revealed that it actually does not employ reasonable tracking measures.  Until that

27  time, Counterclaimants believed BMI's false representations that it could accurately

28  track public performances, and that its royalty statements reflected reliable

9

**COUNTERCLAIM**

1   calculations of public performances.  By the time Counterclaimants learned of the

2   falsity of BMI's representations, Counterclaimants had already paid taxes on,

3   earmarked, and spent much of the royalty payments they had received many months

4   earlier.  By that time, Counterclaimants had also lost their opportunity to challenge

5   royalty statements received from BMI more than nine months earlier.

6   **BMI's Use of Max Golay's Fraud and Accusations as a Pretext for Profiteering**

7           31.      Shortly after notifying Counterclaimants of the alleged royalty

8   overpayments, BMI alleged that Max Golay (the individual who allegedly

9   submitted the incorrect cue sheets to BMI) had implicated Davis in a fraudulent

10  scheme to submit falsified cue sheets for *So You Think You Can Dance* and

11  *Superstars of Dance* to BMI.  Mr. Golay's fraud allegations against Davis are false.

12          32.      According to BMI's allegations, Mr. Golay defrauded BMI by

13  submitting cue sheets to BMI that misstated the number of times his and others'

14  copyrighted works had been publicly performed on *So You Think You Can Dance*

15  and *Superstars of Dance*.  Mr. Golay's position as an employee of the independent

16  contractor hired by the shows' producer to generate cue sheets on its behalf

17  provided Mr. Golay with the access he needed to execute his fraudulent scheme.

18  On information and belief, Mr. Golay inflated the number of times others'

19  copyrighted works had been performed in an attempt to camouflage the fraudulent

20  inflation of his own copyrighted works' performances.  On information and belief,

21  Mr. Golay surmised that if his songs were the only ones with an unusually high

22  number of performances, it would be easier for the shows' producer and/or BMI to

23  detect his fraud.

24          33.      Mr. Golay was an acquaintance of Davis and one of the songwriters

25  represented by CTI.    But Counterclaimants had no prior knowledge of or

26  involvement with Mr. Golay's alleged fraud.  On information and belief, when Mr.

27  Golay's fraud was uncovered he offered to implicate Counterclaimants (the

28  proverbial "bigger fish") in his fraudulent scheme in exchange for leniency from

**COUNTERCLAIM**

1    BMI. Pursuant to their agreement, BMI did not name Mr. Golay as a defendant in

2    this lawsuit despite his admitted culpability for the alleged overpayments at issue.

3       34.    When confronted by BMI, Davis informed BMI that the fraud

4    accusations against him were false. BMI summarily dismissed Davis' denial and

5    began dealing with Counterclaimants as though they had been tried and convicted

6    of the alleged wrongdoing. BMI also commenced a purported "investigation" into

7    other possible overpayments to Counterclaimants.

8       35.    BMI thereafter contacted representatives of various networks and

9    production companies (i.e., Counterclaimants' customers), with which Mr. Golay

10    had no connection or affiliation, defaming and disparaging Davis by accusing him

11    of being a fraud and a crook. On information and belief, BMI's actions were

12    motivated by the hope that it could find support for newly-minted claims that

13    Counterclaimants had received royalty overpayments. Such claims, if successful,

14    would result in a direct financial benefit to BMI. Ultimately, of the dozens of

15    networks and producers BMI contacted, it uncovered no additional instances of

16    actual fraud (though, as discussed below, it has characterized an unrelated run-of-

17    the-mill royalty dispute as fraud). But its "investigation" inflicted irreparable harm

18    to Counterclaimants' business and reputations.

19       36.    On or around June 20, 2010, and admittedly prior to completing its

20    investigation, BMI advised Counterclaimants that it would not be paying them any

21    royalties until BMI completed its investigation and was repaid. BMI has not paid

22    Counterclaimants any royalties since that date. Without warning, BMI then

23    blocked Counterclaimants' access to their online affiliate account. This prevented

24    Counterclaimants from viewing the producers' reporting of performances of

25    Counterclaimants' copyrighted works. While Counterclaimants' online accounts

26    were blocked, they were prevented from challenging any underreporting or failure

27    to pay royalties due. This resulted in a direct financial benefit to BMI. BMI's

28    blocking of Counterclaimants' online accounts also prevented them from

**COUNTERCLAIM**

1  registering with BMI songs they had successfully placed with television producers.
2  BMI does not pay royalties for unregistered songs. Preventing Counterclaimants
3  from registering new songs that were publicly being performed provided a direct
4  financial benefit to BMI.

5      37.   On August 6, 2010, BMI restored Counterclaimants' ability to register
6  songs online, but continued to block their access to any other information.
7  Counterclaimants' ability to view their online accounts was not restored until
8  September 15, 2011, and only after litigation counsel became involved.

9      38.   In or around mid-to-late-August 2010, BMI claimed that
10  Counterclaimants had also received overpayments of royalties, dating back to 2007,
11  for performances of their copyrighted works on the show *Access Hollywood*. BMI
12  alleged that the cue sheets submitted to BMI by the show's producer, NBC
13  Universal, mischaracterized the nature of the performances of Counterclaimants'
14  works. BMI alleged that the mischaracterizations (or "misdesignations") were
15  components of the fraudulent scheme alleged by Mr. Golay.

16      39.   BMI alleges that an unidentified employee of NBC Universal
17  "confirmed" that NBC Universal's alleged misrepresentations to BMI were the
18  "result" of "information provided to NBC by Davis." But BMI did not seek to
19  confirm whether each of the individual performances at issue were accurate or
20  inaccurate. Instead, with one broad stroke, BMI deemed every designation of an
21  *Access Hollywood* performance other than the least lucrative designation to be a
22  fraudulent designation. BMI then re-designated every performance to the least
23  lucrative designation possible. BMI claimed the difference in royalties payable
24  under the new designation versus the original designation to be an overpayment
25  procured by fraud. Each of the purported re-designations results in a direct
26  financial benefit to BMI. Counterclaimants' subsequent review of some of the re-
27  designated *Access Hollywood* performances revealed that the performances had, in
28  fact, been properly designated.

12

**COUNTERCLAIM**

40.    In reality, the *Access Hollywood* dispute does not involve fraud at all. Rather, it is an attempt by BMI to use Mr. Golay's fraud accusations as a pretext for a cash-grab. Mr. Golay has no involvement or affiliation with *Access Hollywood* or NBC Universal. Mr. Golay never alleged that performances of works on *Access Hollywood* were part of his fraudulent scheme. BMI has not identified any representative or employee of NBC Universal with whom Counterclaimants could have conspired to cause NBC Universal to submit falsified cue sheets to BMI. The dispute regarding the *Access Hollywood* performances is completely unrelated to the fraud alleged by Mr. Golay.

41.    The Writer Agreement, DDM Agreement and CTI Agreement (collectively, the "Agreements") include mandatory procedures for the resolution of royalty disputes. Rather than comply with these provisions, BMI unilaterally determined that Counterclaimants were guilty of fraud and not entitled to the alleged overpayments. BMI unlawfully assumed the role of "judge and executioner" with respect to the parties' dispute, purporting to adjudicate the dispute in its favor and then engaged in self-help by seizing Counterclaimants' subsequently earned royalties to satisfy its "judgment."

42.    BMI's conduct described above was motivated by bad faith and is inexcusable. Despite the fact that Counterclaimants' music catalog is one of the most highly used catalogs in BMI's repertory, Counterclaimants have not received a single royalty payment in approximately a year-and-a-half. Although BMI alleges that Counterclaimants received royalty overpayments, their agreements do not contain any provisions authorizing the self-help remedies BMI has employed. As part of its heavy-handed litigation strategy against Counterclaimants BMI has: (a) starved Counterclaimants out of nearly half-a-million dollars in earned royalties; (b) blocked Counterclaimants' ability to monitor performances of their copyrighted works by disabling their online accounts; (c) blocked Counterclaimants' ability to earn royalties from newly placed songs by disabling their online accounts; (d)

13

**COUNTERCLAIM**

1   attempted to gain leverage by contacting and involving in the dispute many more
2   networks and producers than were implicated by its purported "fraud
3   investigation"; and (e) attempted to gain leverage by improperly naming Davis'
4   wife and other family members as defendants in the instant lawsuit despite
5   possessing no evidence of their knowledge of or involvement in Mr. Golay's
6   alleged fraud.   BMI has severely damaged Counterclaimants' business and
7   reputations.

8   ### FIRST CAUSE OF ACTION

9   ### (For Breach of Contract by Counterclaimants Against BMI)

10      43.   Counterclaimants repeat and reallege the allegations set forth in
11   Paragraphs 1 through 42, as though fully set forth herein.

12      44.   Davis is a party to the valid and enforceable Writer Agreement and
13   DDM Agreement with BMI and CTI is a party to the valid and enforceable CTI
14   Agreement with BMI.   Pursuant to the Agreements, in exchange for
15   Counterclaimants' granting BMI the right to license their copyrighted works for
16   public performances, BMI promised to pay to Counterclaimants, on a quarterly
17   basis, royalties calculated pursuant to BMI's "then current standard practices" upon
18   the basis of BMI's "then current performance rates."

19      45.   Counterclaimants have substantially performed, or have been excused
20   from performing, all of their obligations under the Agreements.

21      46.   BMI materially breached the Agreements by failing to make any
22   royalty payments to Counterclaimants for approximately a year-and-a-half to date,
23   by blocking their access to their online affiliate accounts for more than one year,
24   and by purporting to adjudicate a royalty dispute with Counterclaimants without
25   complying with the dispute resolution procedures set forth in the Agreements.
26   Nothing in the Agreements authorizes or excuses BMI's withholding of royalties
27   duly earned by Counterclaimants or precluding them from viewing online
28   information relating to performances of their copyrighted works.

14

**COUNTERCLAIM**

47.   As a direct and proximate result of BMI's breach of the Agreements, Counterclaimants have been damaged in an amount to be determined at trial, but in any event no less than $391,678.59.

### SECOND CAUSE OF ACTION

### (For Breach of the Implied Covenant of Good Faith and Fair Dealing by Counterclaimants Against BMI)

48.   Counterclaimants repeat and reallege the allegations set forth in Paragraphs 1 through 47, as though fully set forth herein.

49.   Davis and CTI are parties to one or more of the valid and enforceable Agreements with BMI.

50.   California law implies the covenant of good faith and fair dealing in every contract to ensure one contracting party does not unfairly frustrate the other party's right to receive the benefits of their agreement.

51.   BMI breached the implied covenant of good faith and fair dealing in the Agreements by:

    (a)   Failing to truly and accurately inform Counterclaimants as to their rights under the Agreements;

    (b)   Failing to truly and accurately inform Counterclaimants as to their earnings under the Agreements' royalty provisions;

    (c)   Unreasonably withholding royalties due under the Agreements;

    (d)   Failing to evaluate royalty disputes with Counterclaimants competently and objectively and to fairly investigate grounds for payment or withholding of royalties under the Agreements;

    (e)   Failing to utilize reasonable and/or reliable procedures to track public performances of Counterclaimants copyrighted works;

    (f)   Using unsubstantiated accusations of fraud against Counterclaimants, made by an individual admittedly lacking in credibility, as a pretext for raising unrelated and stale royalty

15

**COUNTERCLAIM**

overpayment claims against Counterclaimants;

(g)    Blocking Counterclaimants' access to their online affiliate accounts and thereby preventing them from monitoring their copyrighted works;

(h)    Blocking Counterclaimants' access to their online affiliate accounts and thereby preventing them from registering (and thus earning royalties for) new songs being publicly performed;

(i)    Failing to comply with the Agreements' dispute resolution procedures; and

(j)    Failing to afford Counterclaimants due process in connection with its seizure of Counterclaimants' earnings.

52.    BMI's failure or refusal to discharge its contractual responsibilities was conscious and deliberate and unfairly frustrates the parties' agreed common purposes and disappoints the reasonable expectations of Counterclaimants, thereby depriving Counterclaimants of the benefits of the Agreements.

## THIRD CAUSE OF ACTION

### (For Conversion by Counterclaimants Against BMI)

53.    Counterclaimants repeat and reallege the allegations set forth in Paragraphs 1 through 52, as though fully set forth herein.

54.    Counterclaimants are the owners or possessors of personal property – i.e., copyright royalty payments earned by Counterclaimants pursuant to the Agreements. The amount payable to Counterclaimants for royalties earned during the year-and-a-half period that BMI has been withholding payments is a specific sum capable of identification. Counterclaimants are entitled to possession of the withheld royalty payments.

55.    As alleged above, BMI interfered with Counterclaimants' ownership or right to possession of said royalty payments by assuming control or ownership over the royalty payments and/or applying the royalties payable to

**COUNTERCLAIM**

1   Counterclaimants to BMI's own use – i.e., to unilaterally satisfy its unadjudicated
2   purported claims against Counterclaimants.

3       56.   BMI's interference with Counterclaimants' ownership or right to
4   possession of the earned copyright royalties was knowing, intentional and unlawful.

5       57.   Counterclaimants have requested remittance of the royalty payments to
6   no avail.

7       58.   Counterclaimants have been damaged as a direct and proximate result
8   of BMI's interference.

9                   **FOURTH CAUSE OF ACTION**

10   **(For Negligent Misrepresentation by Counterclaimants Against BMI)**

11      59.   Counterclaimants repeat and reallege the allegations set forth in
12   Paragraphs 1 through 58, as though fully set forth herein.

13      60.   BMI represented to Counterclaimants that that BMI could accurately
14   track the public performances of their music on television.   BMI's ability to
15   accurately track the public performances of Counterclaimants' music was important
16   to them because the royalties payable to them are calculated based, in part, on the
17   number of times their songs are publicly performed.   If BMI had represented to
18   Counterclaimants that it was unable to accurately track public performances on
19   television Counterclaimants would not have entered into the Agreements.

20      61.   BMI's representations regarding its ability to accurately track public
21   performances of Counterclaimants' music on television were not true.

22      62.   Although BMI may have honestly believed that its representations
23   regarding its ability to accurately track public performances of Counterclaimants'
24   music was true, it had no reasonable grounds for believing the representation was
25   true when it made it.   When BMI made the representations to Counterclaimants, it
26   was already aware of the fact that the reporting provided by television producers on
27   which it relied was often inaccurate and ultimately unreliable.

28      63.   Hoping to induce Counterclaimants to affiliate with BMI, BMI

17

**COUNTERCLAIM**

1    intended that Counterclaimants rely on its representations regarding its ability to

2    accurately track public performances of Counterclaimants' music.

3          64.     Because BMI has been in business for over seventy years and is one of

4    the two PROs that license virtually all copyrighted music in the United States,

5    Counterclaimants reasonably relied on BMI's representations.   Counterclaimants

6    did not learn of the falsity of BMI's representations until June 2010 when BMI

7    claimed that it had erroneously paid them over $1 million in royalties for

8    performances that allegedly had not occurred.

9          65.     As a direct and proximate result of BMI's negligent misrepresentations

10   and Counterclaimants' reliance thereon, Counterclaimants have been harmed in an

11   amount to be proven at trial.

12   **FIFTH CAUSE OF ACTION**

13   **(For Negligence by Counterclaimants Against BMI)**

14         66.     Counterclaimants repeat and reallege the allegations set forth in

15   Paragraphs 1 through 65, as though fully set forth herein.

16         67.     By virtue of the parties' relationship and relative abilities to track

17   public performances of compositions covered by the Agreements, BMI had a duty

18   to exercise reasonable care in the tracking of such public performances.  BMI also

19   had a duty to use reasonable care when investigating allegations of fraud or

20   overpayments leveled against Counterclaimants by third parties.

21         68.     BMI breached its aforementioned duties by: (a) failing to employ

22   reasonable procedures to ensure and promote the accurate tracking of public

23   performances of Counterclaimants' copyrighted works; and (b) Conducting its

24   investigation of fraud allegations made against Counterclaimants in a manner that

25   hindered BMI's, Counterclaimants' and others' ability to thoroughly and/or

26   independently investigate the allegations.

27         69.     As a direct and proximate result of BMI's negligence,

28   Counterclaimants have been damaged in an amount to be determined at trial.

18

**COUNTERCLAIM**

## SIXTH CAUSE OF ACTION

### (For Violation of Business & Professions Code § 17200 *et seq.* by

### Counterclaimants Against BMI)

70.   Counterclaimants repeat and reallege the allegations set forth in Paragraphs 1 through 69, as though fully set forth herein.

71.   BMI markets and promotes itself and the services it provides through misleading statements to the public.  BMI holds itself out to the public as a not-for-profit corporation primarily motivated by the desire to serve and advance the interests of writers and publishers.  BMI's statements imply that it is as protective of writers' and publishers' rights as ASCAP or SESAC.  BMI's statements to the public also imply that BMI serves merely as a mere intermediary that administers the licensing of copyrighted music on behalf of and for the convenience of affiliated copyright owners in exchange for a reasonable commission necessary to pay BMI's operating expenses.

72.   In reality, BMI is a profit-driven corporation founded and owned by members of the broadcasting industry.  ASCAP's and SESAC's operations are much more favorable to writers and publishers than BMI's.  BMI prioritizes its own income, which benefits BMI's broadcasting industry owners, over the income and general well-being of its affiliated songwriters and publishers.

73.   BMI's statements are likely to deceive members of the public into affiliating with BMI, rather than ASCAP or SESAC.

74.   BMI's representations may have included some accurate information, but nonetheless tended to mislead or deceive members of the public.  BMI's statements were couched in such a manner that they are likely to mislead or deceive the consumer.  BMI failed to disclose other relevant information, which would have revealed the true nature of BMI's statements.  An ordinary consumer relying on the plain language of BMI's representations would not be able to discern the true nature of BMI's operations and motivations.

19

**COUNTERCLAIM**

75. Furthermore, BMI's business practice of withholding royalty payments from affiliates during the pendency of an unadjudicated dispute between BMI and the affiliate claiming a right to the royalty payments is unfair.

76. BMI's aforementioned conduct constitutes unlawful, unfair and deceptive business practices within the meaning of California Business and Professions Code section 17200, *et seq.*

77. As a result of BMI's unlawful, unfair and deceptive business practices, Counterclaimants and the general public have been deprived of funds to which they are entitled pursuant to statute as more particularly described hereinabove. BMI is liable to make restitution of all sums obtained in excess of the amounts they would have obtained without their unfair business practices, together with interest on the liquidated sum owing and attorneys' fees and costs as determined by the Court. Counterclaimants also seek an injunction enjoining BMI from continuing to commit the aforementioned unlawful practices.

78. Counterclaimants will amend the complaint at the time of trial to include additional persons who continue to be subjected to BMI's unfair business practices until such time as the practice has been enjoined. Further, Counterclaimants reserve the right to supplement the restitution award after trial and until an injunction is issued to include additional persons who have been damaged by BMI's unfair business practices.

## SEVENTH CAUSE OF ACTION

### (For Rescission by Davis Against BMI)

79. Counterclaimants repeat and reallege the allegations set forth in Paragraphs 1 through 78, as though fully set forth herein.

80. Davis is entitled to rescind the Writer Agreement and DDM Agreement because Davis' consent was given by mistake, the consideration for the Davis' obligations under the agreements has failed, in whole or in part, through BMI's fault, and Davis' consent was given in reliance on misrepresentations of

20

**COUNTERCLAIM**

1  material fact by BMI.

2      81.   When Davis entered into the Writer Agreement and DDM Agreement,

3  and in reliance on representations made by BMI, he mistakenly believed that the

4  public performances of his copyrighted works on television shows could be

5  accurately measured and that the royalty payments he had bargained to receive

6  were to be based on an accurate calculation of the number of the public

7  performances of his compositions. Davis has since learned that BMI does not have

8  the ability, or refuses to employ measures that would enable it, to accurately

9  measure the public performances of his copyrighted works. BMI's representation

10  that it could and would accurately track the public performances of Davis'

11  copyrighted works was a material inducement for Davis' agreement to enter into

12  the Writer Agreement and DDM Agreement.

13      82.   A significant portion of the consideration Davis was to receive in

14  exchange for his grant of rights to BMI was the quarterly payment of royalties

15  earned by Davis based on the public performances of his copyrighted works by

16  licensees. Said consideration has failed, in whole or in part, through the fault of

17  BMI. BMI is purportedly withholding of Davis' earned royalties as a self-help

18  remedy. But BMI possesses no legal authority for such withholding.

19      83.   As a direct and proximate result of BMI's conduct alleged herein,

20  Davis has sustained damages in an amount to be determined at trial.

21                        **EIGHTH CAUSE OF ACTION**

22        **(For Declaratory Relief by Counterclaimants Against BMI)**

23      84.   Counterclaimants repeat and reallege the allegations set forth in

24  Paragraphs 1 through 83, as though fully set forth herein.

25      85.   An actual controversy exists between the parties related to their

26  respective legal rights and duties under the Agreements.

27      86.   Counterclaimants contend that BMI is not entitled to withhold

28  royalties payable to Counterclaimants under the Agreement to offset amounts

**COUNTERCLAIM**

1   claimed by BMI in an unadjudicated dispute regarding the alleged overpayment of
2   royalties. Counterclaimants contend that BMI is required to employ measures to
3   track the public performances of Counterclaimants' work on television that are
4   more reliable than the reporting of television show producers and the other
5   measures currently employed by BMI. Counterclaimants contend that, during the
6   respective terms of the Agreements, BMI may not block Counterclaimants' access
7   to online information regarding their copyrighted works. Counterclaimants contend
8   that the normal nine-month period during which affiliates are entitled to submit
9   claims for adjustment of BMI's royalty distributions was tolled during the prior of
10  time that BMI blocked Counterclaimants' access to their online accounts.

11      87.   On information and belief, BMI disputes Counterclaimants'
12  contentions immediately above.

13      88.   A judicial declaration is necessary and appropriate so the parties may
14  ascertain their respective rights, duties and obligations.

15      89.   Based on this actual controversy, Counterclaimants request a judicial
16  declaration by way of a judgment in favor of Counterclaimants and against BMI
17  stating that: (a) BMI has breached the Agreements; (b) BMI is not entitled to
18  withhold royalties payable to Counterclaimants under the Agreement to offset any
19  amounts that are the subject of an unadjudicated royalty dispute between
20  Counterclaimants and BMI; (c) BMI is required to employ methods of tracking the
21  public performances of Counterclaimants' work on television that are more reliable
22  than the reporting of television show producers and the other measures currently
23  employed by BMI; (d) during the respective terms of the Agreements, BMI may not
24  block Counterclaimants' access to online information regarding their copyrighted
25  works; and (e) the normal nine-month period during which affiliates are entitled to
26  submit claims for adjustment of BMI's royalty distributions was tolled during the
27  prior of time that BMI blocked Counterclaimants' access to their online accounts.

28

**COUNTERCLAIM**

### **PRAYER**

WHEREFORE, Counterclaimants pray for the following relief:

1.     For compensatory damages according to proof, but in any event no less than $391,678.59, plus pre-judgment interest;

2.     For an order enjoining BMI from utilizing misleading statements in advertisements and promotional material to compare its loyalty to songwriters and publishers with that of other PROs;

3.     For an order enjoining BMI from utilizing misleading statements in advertisements and promotional material regarding its ability to accurately track public performances of its affiliates copyrighted works on television shows;

4.     For an order requiring BMI to pay restitution to any person deprived of money or property as a result of any of the unlawful business practices alleged in this Counterclaim;

5.     For an order requiring BMI to accurately and truthfully account for and disgorge to Counterclaimants any and all gross revenue BMI derived from any of the unlawful business practices alleged in this Counterclaim;

6.     For consequential damages;

7.     For rescission of the Writer Agreement between Davis and BMI;

8.     That judgment be entered in favor of Counterclaimants against BMI;

9.     For the award of costs of suit;

10.    For an award of pre-judgment and post-judgment interest thereon as provided by law; and

11.    For such other relief as the Court deems proper and just.

/ / /

/ / /

/ / /

/ / /

**COUNTERCLAIM**

1

### DEMAND FOR TRIAL BY JURY

2     Counterclaimants demand a trial by jury of all claims that are so triable.

3

4     DATED:  December 1, 2011                    KNIGHT LAW GROUP

5

6

7                                        By:

8                                            Raaqim Knight
                                             *Attorneys for Defendant*
                                             YASMINAH COMBARY, and *Defendants*
9                                            *and Counterclaimants* DEYON DAVIS and
                                             CINEMATIC TUNES, INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNTERCLAIM**